826                                              363 Mass. 826

Commissioner of Dept. of Comm. Affairs *v.* Medford Housing Authy.


COMMISSIONER OF THE DEPARTMENT OF COMMUNITY
AFFAIRS *vs.* MEDFORD HOUSING AUTHORITY
(and a companion case [1]).

Suffolk.    May 9, 1973. — July 10, 1973.

Present: TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, & WILKINS, JJ.

*Housing.    Equity Jurisdiction,* Housing, Declaratory relief.    *Regulation.*

A suit in equity by the Commissioner of the Department of Community Affairs against a local housing authority for declaratory relief as to the Commissioner's authority to promulgate certain regulations and for injunctive relief to enforce them was authorized by G. L. c. 121B, § 29 [829]; consolidation of such suit with a suit seeking similar relief brought by tenants of State-aided public housing of the local housing authority had the effect of allowing them to intervene in the Commissioner's suit and amounted to no more than an opportunity for the tenants to argue as friends of the court [829].

Under G. L. c. 121B, § 29, the Department of Community Affairs has the power to regulate all the affairs of local housing authorities, including their internal operation. [829–830]

The establishment by a local housing authority of a procedure whereby tenants were required to request that the Internal Revenue Service furnish to the housing authority a copy of page 1 of the tenants' Federal income tax returns, was ineffective under G. L. c. 121B, § 11(m), in the absence of approval by the Department of Community Affairs. [831–832]

In a suit in equity for declaratory relief respecting certain regulations of the Department of Community Affairs, no actual controversy with respect to them appeared, merely abstract, hypothetical or contingent questions inappropriate for judicial resolution. [832–833]

The fact that a regulation of the Department of Community Affairs had the effect of requiring an expenditure of funds by a local housing authority did not violate the policy set forth in G. L. c. 121B, § 32, that "each housing authority shall manage and operate decent, safe and sanitary dwelling accommodations at the lowest possible cost." [833–834]

In a suit in equity for declaratory relief by the Commissioner of the Department of Community Affairs against a local housing authority, no controversy was presented with respect to distinct problems of federally aided housing projects of the authority. [834–835]

[1] Daniel Bates & others *vs.* Medford Housing Authority.

363 Mass. 826                                    827

Commissioner of Dept. of Comm. Affairs *v.* Medford Housing Authy.

TWO BILLS IN EQUITY filed in the Supreme Judicial Court for the county of Suffolk on April 10, 1973, and April 24, 1974.

The suits were reserved and reported by *Braucher*, J.

*Danielle E. deBenedictis*, Assistant Attorney General (*Walter H. Mayo, III*, Assistant Attorney General, with her) for the Commissioner of Community Affairs.

*Melvyn Zarr* (*Daniel D. Pearlman & Howard E. Cohen* with him) for Daniel Bates & others.

*John S. Ahern* for Medford Housing Authority.

*Jeanne C. Kettleson*, for Boston Housing Authority & another, amici curiae, submitted a brief.

BRAUCHER, J. The plaintiff, the Commissioner of the Department of Community Affairs (DCA), filed a bill in equity in the county court seeking declaratory and injunctive relief against the Medford Housing Authority (MHA). DCA seeks a declaration that it had authority to promulgate five sets of regulations covering local housing authorities (LHAs) like MHA: (a) Income and Occupancy Regulations, (b) Regulations for the Determination of Rents in State-Aided Low Rent Housing, (c) Regulations Prescribing Lease Provisions for Public Housing, (d) Regulations Relating to Tenant Grievance Procedures, and (e) Regulations for Tenant Participation in the Administration of Public Housing in Massachusetts. DCA also seeks injunctive relief to enforce the declaration. MHA denies the authority of DCA to promulgate the regulations and refuses to comply with them.

In the companion case, four tenants of State-aided public housing in Medford seek similar relief against MHA. A single justice of this court allowed a motion to consolidate the two suits and reserved and reported them for determination by the full court upon the pleadings and a statement of agreed facts.

We summarize the agreed facts. MHA is obliged by its "Financial Assistance Contracts" with the Commonwealth to administer its State-aided housing projects in

accordance with DCA regulations. The Income and Occupancy Regulations promulgated by DCA became effective December 30, 1971; they provided that within one month of their effective date MHA should submit to DCA a description of its procedure for determining tenants' income. MHA has not done so. Before January, 1972, MHA required all its tenants to submit annually applications for continued occupancy and copies of W-2 Forms filed with the Internal Revenue Service (IRS) in the previous year. In January, 1972, MHA notified its tenants that each was also required to furnish Form 4506, which would allow MHA to obtain a copy of page 1 of the tenants' Federal income tax return. This "4506 procedure" has never been submitted to or approved by DCA; by letters dated March 2, 1972, and April 5, 1972, DCA disapproved the procedure and directed MHA to discontinue it and to notify DCA as to the steps taken. MHA has not so notified DCA.

In July, 1972, MHA voted to initiate eviction proceedings against tenants who failed to comply with the "4506 procedure." Forty-two of 766 tenants failed to comply, and about February 7, 1973, MHA notified the four tenant plaintiffs and two tenants of federally-aided projects of its intent to evict them. After a hearing held on February 26, 1973, at the request of those six tenants, MHA voted to evict each of them. On or before March 1, 1973, notice of intention to terminate the tenancy on April 1, 1973, was served on each of the six tenants.

On February 22, 1973, DCA issued the remaining four sets of regulations here in issue. Those regulations were filed with the Secretary of State on February 26, 1973, and published by him on March 2, 1973. By a letter dated March 9, 1973, DCA again disapproved the "4506 procedure" and ordered MHA to discontinue it. These suits followed, and a preliminary injunction was issued against the threatened evictions. The Boston Housing Authority and the Somerville Housing Authority filed a brief as friends of the court supporting the position of DCA.

363 Mass. 826                                               829

Commissioner of Dept. of Comm. Affairs *v.* Medford Housing Authy.

1. *Authority for these suits.* The suit by DCA is authorized by G. L. c. 121B, § 29, inserted by St. 1969, c. 751, § 1: "Except as otherwise stated therein, compliance with this chapter, the rules and regulations adopted by the department and the terms of any low-rent housing project or clearance project authorized by this chapter, may be enforced by a proceeding in equity." See the prior provision, G. L. c. 121, § 26U; *Sullivan* v. *Fall River Housing Authy.* 348 Mass. 738, 739. The *Sullivan* case raises some question as to the authorization for the suit by the tenants. But no objection is made on that account, the tenants have an obvious and vital interest in the controversy, and the consolidation of the two suits is like allowance of a motion to allow the tenants to intervene in the DCA suit. It amounts to no more than an opportunity for the tenants to argue as friends of the court. See *Cambridge Elec. Light Co.* v. *Department of Pub. Util. ante,* 474, 504. Compare *West Broadway Task Force, Inc.* v. *Commissioner of the Dept. of Community Affairs, ante,* 745, 749–751.

2. *Authority for regulations.* The basic controversy relates to the scope of DCA's power to issue regulations under G. L. c. 23B, § 6,[2] and c. 121B, § 29.[3] DCA contends, relying on the legislative history of the statutes, that the Legislature intended LHAs to be "operating agencies" (G. L. c. 121B, § 1) subject to the broad supervision and control of DCA. See 1938 House Doc. No. 1706, pp. 12–14; 1970 House Doc. No. 5000, pp. 10–14; 1970 House Doc. No. 5263, pp. 2–3; Rep. A. G., Pub. Doc. No. 12 (1967) 237; Rep. A. G., Pub. Doc. No. 12 (1971) 49. It points also to G. L. c. 121B, § 11 (m), as amended by St. 1970, c. 851, § 2, under which an "operating

---

[2] Inserted by St. 1968, c. 761, § 1, it reads: ". . . The commissioner shall make, and from time to time revise, regulations for the conduct of the business of the department, and such other regulations as may be required by law."

[3] Inserted by St. 1969, c. 751, § 1, it reads: ". . . The department may from time to time make, amend and repeal rules and regulations prescribing standards and stating principles governing the planning, construction, maintenance and operation of clearance and housing projects by housing authorities. . . ."

agency" has the power "(m) To make, and from time to time amend or repeal, *subject to the approval of the department,* by-laws, rules and regulations, not inconsistent with pertinent rules and regulations of the department to govern its proceedings and effectuate the purposes of this chapter" (emphasis supplied). MHA responds that DCA has no legislative authority to make rules for the internal operation of local housing projects, that the DCA regulations, instead of prescribing "standards" and "principles," restrict the operations of the LHA and take away any individual discretion in its essential operating and management functions, and that G. L. c. 121B, § 32, spells out in detail the requirements the LHA must follow in the internal operation of its affairs.

Without extended discussion, we hold that DCA is right and MHA is wrong in this basic controversy. We have recognized the "supervisory capacity" of the responsible State agency under predecessor statutes. G. L. c. 121, § 26EE, as appearing in St. 1938, c. 484, § 1. *Wellesley Housing Authy.* v. *S. & A. Allen Constr. Co.* 340 Mass. 466, 473. *Sullivan* v. *Fall River Housing Authy.* 348 Mass. 738, 739. *Belinfante* v. *Mayor of Revere,* 352 Mass. 712, 714. We do not find in the statutes any such distinction between standards and principles, on the one hand, and internal operations, on the other, as that for which MHA contends. See *Cambridge Elec. Light Co.* v. *Department of Pub. Util. ante,* 474, 494–495. General Laws c. 121B, § 29, authorizes "regulations prescribing standards and stating principles governing the . . . maintenance and operation of . . . housing projects by housing authorities." The authority so granted is ample to cover large matters and small, procedural and substantive, internal and external. Any type of decision which is open to LHAs is also open to supervision by DCA. See *West Broadway Task Force, Inc.* v. *Commissioner of the Dept. of Community Affairs, ante,* 745, 747–748; Friedman, Public Housing and the Poor: An Overview, 54 Cal. L. Rev. 642, 662–669.

363 Mass. 826                                                831

Commissioner of Dept. of Comm. Affairs *v.* Medford Housing Authy.

3. *The "4506 procedure."* It is common ground that the standards and tests of eligibility of tenants for continued occupancy are to be those prescribed by DCA in accordance with the law. Similarly, it is not disputed that to determine eligibility LHAs must determine the net income of each tenant family, nor that they may properly require annual submission of an application for continued occupancy. There is no attack on MHA's requirements that the application contain an income statement and be accompanied by W-2 Forms. But it is disputed whether MHA may properly require tenants to execute IRS Form 4506, requesting IRS to furnish to MHA a copy of page 1 of the tenants' Federal income tax return.

This "4506 procedure," if proper, is part of the "bylaws, rules and regulations" of MHA, and under G. L. c. 121B, § 11 (m), is "subject to the approval of the department" and must not be "inconsistent with pertinent rules and regulations of the department." To implement § 11 (m), DCA Income and Occupancy Regulations, §§ 1.1 and 1.2, properly require LHAs to send to DCA copies of detailed descriptions of their income and rental determination procedures. MHA did not do so, nor did it seek or obtain DCA's approval of the requirement. MHA alleges that it had no knowledge of the regulation prior to suit, but it was specifically notified in writing three times that DCA disapproved the MHA requirement. It follows that the establishment of the "4506 procedure" by MHA was ineffective under G. L. c. 121B, § 11 (m), in the absence of DCA approval.

Initially DCA flatly disapproved any requirement "that tenants submit a photostatic copy of their tax return from the Internal Revenue Service, for occupancy or continued occupancy." The DCA regulations issued February 22, 1973, however, forbid a requirement "that tenants disclose copies of income tax returns or portions thereof, unless the LHA has established reasonable cause that the tenant is supplying false or incomplete information." DCA Regulations for the Determination of Rents in State-Aided Low Rent Housing, § 3H (2). MHA con-

tends with some force that the "4506 procedure" provides the best available verification of tenants' incomes, that it involves no harassment or unwarranted intrusion into private affairs of the tenants, and that no one has suggested how MHA can establish "reasonable cause" without any investigative staff or investigative powers.

We assume, without deciding, that there is no obstacle to the "4506 procedure" in the Federal tax laws. See *Finance Commn. of Boston* v. *McGrath*, 343 Mass. 754, 766–768. Reasonable men may differ, however, as to the wisdom or even the constitutionality of compulsory disclosure of tax returns for purposes other than administration of the tax laws. See *Leave* v. *Boston Elev. Ry.* 306 Mass. 391, 398–403; *Opinion of the Justices*, 328 Mass. 663, 665–666, 672–673 (separate opinion of Counihan, J.) ; *Grand Jurors for Worcester County for the Year 1951* v. *Commissioner of Corps. & Taxn.* 329 Mass. 89, 90–91; *Opinion of the Justices*, 354 Mass. 804, 809–810. It is not contended that there is any statutory mandate for the "4506 procedure." It follows that it is within the power of DCA to disapprove that procedure or to direct that it be employed only in restricted circumstances. The remedy of MHA, if it believes that the disapproval or restriction is unwise, is not to disobey, but to seek to persuade DCA to do the wise thing.

4. *Validity of other regulations.* In support of its broad attack on the regulatory powers of DCA, MHA makes a variety of adverse comments on specific provisions of the five sets of regulations here in issue. Except for the specific controversy with respect to the "4506 procedure," discussed above, those comments seem to raise "abstract, hypothetical or contingent questions" inappropriate for judicial resolution. See *Thorpe* v. *Housing Authy. of Durham*, 393 U. S. 268, 284; *Housing Authy. of Omaha* v. *United States Housing Authy.* 468 F. 2d 1, 10 (8th Cir.), cert. den. 410 U. S. 927. Moreover, so far as the regulations have not yet been put to practical use, MHA could ask from the court at this time an opinion only as to their "apparent or surface valid-

ity," subject to reconsideration if practice should show up particular features in a new light. *Cambridge Elec. Light Co.* v. *Department of Pub. Util. ante,* 474, 494.

The Income and Occupancy Regulations, effective December 30, 1971, have been largely superseded by the more detailed regulations promulgated February 22, 1973. DCA concedes that certain provisions of the rent determination regulations may be in conflict with the governing statutes, and informs us that those provisions are in the process of being rescinded. The regulations prescribing lease provisions require LHAs to submit leases for approval by June 30, 1973, but provide for extensions to August 31, 1973; the grievance procedure regulations require LHAs to adopt such procedures on a similar schedule. A model lease and a model grievance procedure are provided, but language may be changed so long as "minimum requirements" are met; even the minimum requirements may be waived by DCA. The regulations for tenant participation in administration likewise provide "minimum requirements" subject to waiver; "specifics" are to be "defined and agreed upon between the LHA and the public housing community at the local level." Interim provisions are made which are presently in effect, but no actual controversy with respect to them remains once the controversy with respect to the "4506 procedure" is resolved.

In this situation we express no opinion as to interpretation or validity with respect to specific details, or on MHA's suggestions that various provisions are in conflict with specific statutory provisions. We do hold, however, contrary to MHA's contention, that the fact that a regulation has the effect of requiring an expenditure of funds does not establish a violation of the policy that "each housing authority shall manage and operate decent, safe and sanitary dwelling accommodations at the lowest possible cost." G. L. c. 121B, § 32. We note that the DCA regulations are similar in many respects to circulars promulgated earlier by the Renewal and Housing Management Division of the Federal Department of Housing

and Urban Development. In the face of a statutory policy of local autonomy which has no counterpart in the Massachusetts statutes, those circulars have been uniformly upheld. 42 U. S. C. § 1401 (1970). *Glover* v. *Housing Authy. of Bessemer,* 444 F. 2d 158 (5th Cir.). *Housing Authy. of Omaha* v. *United States Housing Authy.* 468 F. 2d 1 (8th Cir.), cert. den. 410 U. S. 927. *Brown* v. *Housing Authy. of Milwaukee,* 471 F. 2d 63 (7th Cir.). *Chicago Housing Authy.* v. *Harris,* 49 Ill. 2d 274. *Housing Authy. of Milwaukee* v. *Mosby,* 53 Wis. 2d 275. See Lefcoe, HUD's Authority to Mandate Tenants' Rights in Public Housing, 80 Yale L. J. 463, 476–491; Note, 86 Harv. L. Rev. 880, 913.

5. *Federally-aided housing.* DCA's bill alleges that MHA is obliged to operate federally-aided housing projects as well as State-aided projects in accordance with DCA regulations. MHA denies that allegation in its answer, but without drawing any distinction between State-aided projects and federally-aided projects. The statement of agreed facts, which the parties agree contains "all the facts material to the issues in this proceeding," likewise draws no such distinction, except that four of the tenants threatened with eviction are said to be tenants of State-aided projects, two of federally-aided projects.

DCA argues that its regulatory authority extends to federally-aided projects, and that its regulations are not preëmpted by Federal regulations, citing *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 142, *Commissioner of Labor & Indus.* v. *Boston Housing Authy.* 345 Mass. 406, 414–416, *Commissioner of Labor & Indus.* v. *Lawrence Housing Authy.* 358 Mass. 202, 207–210, *Glover* v. *Housing Authy. of Bessemer,* 444 F. 2d 158 (5th Cir.), and *Housing Authy. of Omaha* v. *United States Housing Authy.* 468 F. 2d 1 (8th Cir.), cert. den. 410 U. S. 927. MHA does not argue these points, and no Federal regulation has been brought to our attention which conflicts with the DCA regulations. By reply brief DCA suggests that if the point is material the cases

could be remanded to the single justice for amendment of the statement of agreed facts to include a letter dated May 1, 1973, from the area director of the Federal Department of Housing and Urban Development stating that his office "has no objection" to DCA's proposed lease and grievance procedures.

In these circumstances we do not think there is before us a "controversy" with respect to any distinct problems of federally-aided housing projects. In the absence of controversy there is no basis for declaratory or other relief. G. L. c. 30A, § 7; c. 231A, §§ 1–3. See *Tsongas* v. *Secretary of the Commonwealth,* 362 Mass. 708, 714–715; *Cambridge Elec. Light Co.* v. *Department of Pub. Util. ante,* 474, 493.

6. *Disposition.* A final decree is to be entered in the county court declaring that DCA had authority to promulgate the regulations at issue, and that the regulations are generally valid in the sense of this opinion (see point 4, above). A permanent injunction is to issue (1) ordering MHA to comply with the requirement of the DCA Income and Occupancy Regulations, §§ 1.1 and 1.2, within one month of the entry of the decree, (2) restraining MHA from evicting any tenants for failure to furnish Form 4506 except in compliance with DCA regulations, (3) ordering MHA to return to the tenants all such forms furnished by tenants, together with any attendant fees collected from tenants, and restraining MHA from further demands for such forms except in compliance with DCA regulations. The preliminary injunction issued by the single justice is to be simultaneously vacated.

*So ordered.*